MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

FRANK J. RIEBLI (CSBN 221152)
Assistant United States Attorney
    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Frank.Riebli@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 14-212 WHO |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| GEORGE MOORE, III, | Date: October 9, 2014<br>Time: 1:30 p.m. |
| Defendant. | |

Defendant George MOORE, III has been a drug dealer for at least the past 20 years. On this particular occasion, he had a .45 caliber pistol, half a kilo of powder cocaine and almost a kilo of cocaine base ("crack"). Almost half of the cocaine base was packaged for sale in over 300 individual twists. If the government had tested all of the drugs and had charged any of MOORE's prior felony drug convictions, he could have faced a minimum of 25 years in prison. Nonetheless, the government agreed to a 100-month prison term, followed by 5 years of supervised release with an expanded search condition and a requirement that he stay away from the Tenderloin. The government agreed to a plea on these terms because MOORE immediately accepted responsibility and thus saved the government substantial resources associated with getting all of the drugs tested and litigating the case. Moreover, the 5-year stay away order is a significant component of the deal – from the government's perspective –

because it (plus his prison term) will keep MOORE out of the Tenderloin for 13 years. MOORE has contributed to the Tenderloin's misery for years. Shutting down his business for more than a decade will confer a significant benefit to the community. Probation agrees and recommends 100 months. The Court should accept the parties' agreement.

I. FACTS

A. Offense Conduct

On October 1, 2012, San Francisco police officers arrested MOORE and two of his associates, Dereke Gray and Willie McCowan, and executed search warrants on three locations. The officers knew MOORE and McCowan from prior contacts. MOORE was a drug dealer who had been selling crack cocaine from the corner of Jones and Ellis in San Francisco's Tenderloin District for many years. MOORE did not hold the drugs himself – he always had someone else (like McCowan) hold the drugs for him. MOORE directed users to his associates, who then sold the drugs. On the night of October 1, 2012, officers followed MOORE from his apartment in Hayward to an apartment in Oakland – which they had seen him visit on his way into San Francisco on two prior occasions – and then into San Francisco. Pre-Sentence Report ("PSR") ¶¶ 7-8. Once he got off the Bay Bridge, MOORE met with McCowan. Id. ¶ 8. McCowan got into MOORE's van, then got out again a few minutes later. Id. Police immediately stopped McCowan and seized about 350 grams of suspected cocaine base from him. Id. ¶ 9. The drugs were packaged in over 300 individual twists. Those twists were bundled into bags, which were themselves bundled into three larger bags. MOORE's fingerprint was on one of those bags.

The police arrested MOORE a short time later and seized a key ring with several keys on it from him. Id. ¶ 10. The police then went to MOORE's apartment in Hayward. Inside they found several boxes of plastic baggies and scissors and three digital scales. Id. ¶ 13. In a car outside the apartment, the police found over 500 grams of powder cocaine, about 478 grams of suspected cocaine base, and a .45 caliber pistol. Id. ¶ 14. The powder cocaine was in two plastic bags, and the cocaine base was separated into 10 different knotted plastic bags. MOORE's fingerprint was on one of those bags as well. MOORE also had the key to the car in his possession when he was arrested. The car was registered to his ex-wife, Andrew Moore (nee McEroy, one of MOORE's supporters).

The police then went to the Oakland apartment MOORE had visited on his way into San

Francisco. There, they found Dereke Gray and another 240 grams of suspected powder cocaine. Id. ¶ 12. Gray attempted to flush the cocaine down the toilet when the police breached the door. Id. Police also seized $9,953 in cash and a scale. Id. The drugs seized from the toilet were in 14 separate baggies. Most of the bags still had moisture in them at the time the lab examined them. MOORE subsequently petitioned for return of the money seized from the apartment, claiming it was his.

The Alameda County crime tested samples of the drugs in this case.[1] Id. ¶ 16. The lab tested 37.69 grams of the drugs seized from McCowan and confirmed that the drugs were cocaine base. Id. The lab did not test or obtain a net weight for the remaining 314.75 grams of suspected cocaine base. The lab tested the drugs seized from the car outside MOORE's Hayward apartment and concluded they were 500.85 grams of cocaine. Id. The lab also tested samples of the suspected cocaine base seized from the car and confirmed 78.87 grams were cocaine base. Id. The lab did not test the remaining 398.80 grams. Finally, the lab tested some of the drugs seized from the toilet in the Oakland apartment. The lab confirmed 80.13 grams of powder cocaine. Id. The lab did not test the remaining 186.05 grams.

### B. MOORE's Background

MOORE's criminal history extends back almost 30 years, beginning when he was just 13 years old. Earlier in his career as a drug dealer, he conducted the transactions himself, see, e.g., id. ¶¶ 46 and 48, and kept his guns on his person, see, e.g., id. ¶¶ 42, 49, 63. After several trips to jail and prison, MOORE started using other people to hold his drugs, see, e.g., id. ¶ 75, and kept his guns close by but not on his person, see, e.g., id. ¶ 76, as he did in this case. Based on his criminal record and his failure to provide any legitimate employment history, it appears that MOORE has never worked at any occupation other than dealing drugs. MOORE claims now that he has a substance abuse problem, id. ¶ 101, but it is difficult to discern this from his history. The most that can be said is that he has several arrests and convictions for driving under the influence. See, e.g., id. ¶¶ 39, 45, 47.

MOORE is one of six children who grew up in a broken home with a mother who was addicted to drugs. Id. ¶¶ 93-94. MOORE reports that his family was on welfare. Id. ¶ 94. He also reports that his mother was murdered when he was 20 years old. Id. ¶ 95. He has a high school diploma and

---

[1] Because aggregate net weights do not have the significance in state court prosecutions that they do in federal prosecutions, the lab did not test all of the drugs.

attended junior college for a brief period, but never obtained any degrees or certifications. Id. ¶ 103.

**II. DISCUSSION**

The Court must decide whether to accept or reject the parties' agreement. Fed. R. Crim. Proc. 11(c)(3)(A). The Court has broad discretion to accept or reject the plea agreement. United States v. Harris, 679 F.3d 1179, 1182 (9th Cir. 2012). Generally, the Court should consider whether the negotiated sentence "is too lenient or otherwise not in the public interest in light of the factual circumstances specific to the case." Id. See also United States v. Miller, 722 F.2d 562, 565 (9th Cir. 1983) (categorical rules regarding acceptance or rejection of plea agreements are improper). For the reasons below, the Court should find that the agreed sentence is appropriate.

### A. MOORE's Guidelines Range is 130-162 Months.

The government calculates MOORE's Guidelines range as follows:

| Base Offense Level, § 2D1.1(c)(6) | 28 |
|---|---|
| Possession of a gun, § 2D1.1(b)(1) | +2 |
| Leader/organizer, § 3B1.1(c) | +2 |
| Variance in anticipation of the Guidelines reduction effective November 1, 2014 | -2 |
| Acceptance of Responsibility, § 3E1.1 | -3 |
| Adjusted Offense Level | 27 |
| CHC (13 points) | VI |
| Range | 130-162 |

#### 1. MOORE's Base Offense Level is 28.

The Base Offense Level in a drug case is determined by the aggregate weight of the drugs for which the defendant is responsible. U.S.S.G. § 2D1.1 cmt 7. MOORE stipulated that he possessed with the intent to distribute 500.85 grams of powder cocaine and 116.56 grams of cocaine base. When there are multiple drugs, the drugs are converted to an equivalent weight of marijuana. Id. cmt 8(B). MOORE further stipulated that the drugs he possessed were equivalent to 515 kilograms of marijuana. That quantity of marijuana results in a base offense level 28. Id. § 2D1.1(c)(6) (400kg-700 kg).

There is also a substantial amount of untested cocaine base. Though in some cases the Court may estimate drug quantities, id. § 2D1.1 cmt 5; United States v. Gonzalez, 528 F.3d 1207, 1214-15 (9th Cir. 2008), the government is not asking the Court to estimate the total quantity of cocaine base in this

case. Over half of the untested cocaine base was from the jacket seized from McCowan. Those drugs were divided into over 300 individual packages. Those 300 packages were, in turn, bundled into other bags, which were further bundled into larger bags. The remaining untested cocaine base (from the car) was similarly contained in multiple layers of packaging. In this case, the weight of the packaging is not negligible. Thus, the government has not attempted to estimate the net weight of the drugs themselves, and is not asking the Court to undertake that task either.

### 2. MOORE Possessed a Gun.

MOORE agreed to a two-level enhancement for possession a firearm at the time of the offense. The enhancement is appropriate: the gun was in the same duffle bag as the 500 grams of powder cocaine and large quantity of cocaine base. MOORE's finger print was on one of the baggies containing cocaine base. Accordingly, the Court should find that MOORE possessed a gun and it was connected to the drug offense. U.S.S.G. § 2D1.1(b)(1).

### 3. MOORE was a Leader/Organizer.

MOORE also agreed to a two-level enhancement as an organizer or leader in this crime. Guidelines section 3B1.1(c) provides for a two-level enhancement for persons who have a leadership role in the offense. Here, MOORE attempted to insulate himself from the drugs he sold by having other people – including Gray and McCowan – hold and sell the drugs and then provide MOORE the proceeds. But the drugs belonged to MOORE and he provided them to Gray and McCowan. Once on the street, officers observed MOORE direct buyers to his runners to obtain drugs. This makes MOORE at least an organizer. Cf. United States v. Varela, 993 F.2d 686, 691-92 (9th Cir. 1993) (two-level enhancement was appropriate for a defendant who acted as a middleman, putting together drug deals, even if he did not exercise supervisory authority over the other participants).

### 4. The Parties Agreed to a Two-Level Variance.

In April of this year, the Sentencing Commission approved proposed changes to the Guidelines applicable to drug offenses like the one which MOORE admitted. Under the current Guidelines, MOORE's Base Offense Level is 28. U.S.S.G. § 2D1.1(c)(6). Under the proposed revisions to the Guidelines, his Base Offense Level would be 26. Id. § 2D1.1(c)(7) (Nov. 2014 rev.). Though those changes have not yet taken effect – they will take effect on November 14, 2014 unless Congress acts to

the contrary – the government will give MOORE the benefit of that reduction now.  Accordingly, the parties have agreed to a two-level variance to account for the expected change.  The government asks that the Court accept this variance and incorporate it into the Court's calculations.

### 5. The Drug and Gun Charges Are Grouped for Guidelines Purposes.

MOORE also admitted a violation of 18 U.S.C. § 922(g)(1).  This offense is grouped with the drug offense.  U.S.S.G. § 3D1.2(b), (c) and (d).  The offense level applicable to the group is the offense level of the most serious count, after considering the base offense level, special offense characteristics, and role enhancements.  Id. § 3D1.3(a).  As detailed above, the offense level for the drug charge, taking account of those factors, is 32.  The offense level for the gun charge, including similar enhancements, is 24.  See id. § 2K1.2(a)(4)(A) (base offense level 20); id. § 2K2.1(b)(6)(B) (4-level enhancement for gun possession in connection with another felony).  Thus, even if the Court deducts two levels as a variance to account for the pending changes in the guidelines pertaining to drug counts (making the adjusted offense level 30), the base offense level for the drug charge is still the offense level for the group.

### 6. MOORE Accepted Responsibility Early in the Case.

MOORE pleaded guilty a week after his first appearance before the District Court.  Accordingly, he is entitled to a 3-point deduction for early acceptance of responsibility.  Id. § 3E1.1.

### B. The Court Should Sentence MOORE to 100 Months.

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, deter others from committing similar crimes, protect the public from the defendant, and rehabilitate the defendant.  18 U.S.C. § 3553(a)(2); United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008).  The statute sets forth several factors that the Court must consider in determining a just sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities and the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a); Carty, 520 F.3d at 991.  The Guidelines should be the starting point and the initial benchmark.  Gall v. United States, 552 U.S. 38, 49 (2007).  Though the guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  Rita v. United States, 551

1  U.S. 338, 350 (2007).

2       A 100-month sentence is appropriate in this case. MOORE possessed large quantities of both
3  powder cocaine and cocaine base. The quantities MOORE possessed represented thousands of sales to
4  individual users of a drug that the National Institute of Drug Abuse calls a "powerfully addictive drug"
5  that can cause "severe medical complications." Nat'l Inst. on Drug Abuse, NIDA Research Report
6  Series, "Cocaine," (2010 rev.) at 4 (attached hereto). Cocaine – whether snorted in its powder form or
7  smoked in its rock form – causes an immediate, intense, but short-lived feeling of euphoria. Id. at 3-4.
8  Consequently, cocaine users tend to binge-use. Id. at 4. This pattern develops both tolerance to the
9  drug's euphoria-inducing properties and increased sensitivity to the drug's anxiety-producing,
10 convulsant and other toxic effects. Id. Cocaine thus remains a dangerous drug. Willful participation in
11 the distribution of such a large quantity of this poison is reprehensible. Indeed, the product of
12 MOORE's work is visible every day on the streets surrounding the courthouse: countless people whose
13 lives and health have been ruined, who seem oblivious to the filth in which they live because they are
14 focused only on one thing – obtaining one more hit of the poison that is killing them.

15      From the government's perspective, the question the Court must face is why to accept a 100-
16 month sentence for someone like MOORE, who is a drug dealer by occupation and who has been a
17 cancer on the Tenderloin for years. The answer – again, from the government's perspective – is that a
18 100-month sentence is substantial. And MOORE's immediate acceptance of responsibility saved the
19 government substantial resources, allowed the government to protect the identities of two confidential
20 informants, and the combination of a 100-month prison sentence and a 5-year stay-away order will shut
21 down MOORE's business in the Tenderloin. At the time the government accepted this case for
22 prosecution, the DEA lab had about a six-month backlog in testing drugs, due to staffing shortages and a
23 hiring freeze. The fact that MOORE immediately pleaded guilty saved the DEA lab precious time and
24 resources that it would have had to devote to testing all of the drugs seized in this case. MOORE's
25 immediate plea enabled the lab to devote those resources to other cases. Further, the government was
26 able to allocate to other cases the resources that otherwise would have been spent litigating MOORE's
27 case. MOORE's immediate guilty plea thus saved the government significant resources. Moreover, the
28 search warrants that led to the drug seizures in this case were based, in part, on information provided by

two confidential informants. The police officers who handle those informants wanted to protect the informants' identities both to protect the informants and to allow them to continue working as informants. MOORE's decision to plead guilty without seeking disclosure of the informants' identities thus was something the government valued. Finally, MOORE's business was a particular problem for the Tenderloin. He was on the street selling drugs almost every night for years. And he usually had a gun nearby. His continued presence thus made the Tenderloin a more dangerous place for everyone who lived, worked or passed through. The combination of a 100-month prison term plus a 5-year stay away will keep MOORE out of the Tenderloin for more than a decade. That too represents a significant, tangible benefit to the community and is something the government values in this plea deal.

Moreover, the sentence MOORE receives in this case will be double the longest sentence he ever received in state court. Cf. PSR ¶ 49 (4-year prison term). And he will serve 85% of it in prison, 18 U.S.C. § 3624(b), compared to 50% he would serve for a conviction in state court, Cal. Penal Code § 4019(f). The 100-month prison term represents a substantial increase in actual time spent in custody, and thus will provide greater protection to the community.

Finally, MOORE and his supporters claim that he is actually trying to turn his life around. His lengthy record makes that unlikely. But to the extent that his immediate plea reflects at all on his actual acceptance of responsibility for his offenses, that too may make it less likely that he will re-offend.

## III. CONCLUSION

For the foregoing reasons, the Court should accept the parties' plea deal and sentence MOORE to 100 months in prison, plus 5 years of supervised release with the special terms and conditions that Probation recommends.

DATED: October 2, 2014

Respectfully submitted,

MELINDA HAAG
United States Attorney

/s/
FRANK J. RIEBLI
Assistant United States Attorney

GOV'T SENT. MEMO.
CR 14-212 WHO

8